# UNITED STATES DISTRICT COURT
# FOR MARYLAND

SOUTH RIVERKEEPER, a project of SOUTH RIVER FEDERATION, INC., a non-profit corporation, 2830 Solomons Island Road, Suite B, Edgewater, Anne Arundel County,MD 21037, and; CHESAPEAKE BAY FOUNDATION, a non-profit corporation, 6 Herndon Ave., Annapolis, Anne Arundel County, MD 21403;

Plaintiffs,

v.

ANNAPOLIS TOWNE CENTER AT PAROLE, LLC, 2711 Centerville Road Wilmington, DE 19808, and; GREENBERG GIBBONS COMMERCIAL CORPORATION, 10096 Red Run Blvd., Baltimore County, Owings Mills, MD 21117,

Defendants.

Civil Case No.: ___________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)**

South River Federation, Inc. ("SRF"), South Riverkeeper, a project of South River Federation (collectively "Riverkeeper"), and Chesapeake Bay Foundation, Inc. ("CBF") (jointly referred to as "Citizen Enforcers" or "Plaintiffs"), by and through their counsel, hereby allege:

## I. JURISDICTION AND VENUE

1. This is a civil action brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1365. This Court has jurisdiction over the subject matter of this action pursuant to Section

505(a) of the Act, 33 U.S.C. § 1365(a) (citizen suits authorized by the Clean Water Act), 28 U.S.C. § 1331 (Federal Courts have jurisdiction over actions arising under the laws of the United States), and 28 U.S.C. § 1367(a) (Federal Courts have jurisdiction over claims that arise out of the same case or controversy as a claim over which the Federal Courts have original jurisdiction). There is a real and present controversy between the parties. Plaintiffs seek declaratory and injunctive relief, penalties, and fees and costs against Annapolis Towne Center at Parole and Greenberg Gibbons Commercial Corporation (hereinafter referred to as "ATC Developers" or "Defendants") under 28 U.S.C. §§ 2201 and 2202 (declaratory judgment action).

2. Venue is appropriate in this District and Court pursuant to 28 U.S.C. § 1391(b), because the events and omissions giving rise to these claims occurred in Maryland.

3. On July 17, 2007 Citizen Enforcers provided written notice as required by the Act, 33 U.S.C. § 1365(b), to ATC Developers of their violations of the Act and of Citizen Enforcers' intention to file suit. More than the requisite 60-days have passed since the Notice Letter was issued to the ATC Developers, and this action may now go forward. The Notice Letter was also provided to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region III; the Secretary of the Maryland Department of the Environment ("MDE"), the Director of Maryland's Water Management Division within MDE, the Attorney General of Maryland, and the Anne Arundel County Department of Inspections and Permits. Citizen Enforcers are informed, believe, and allege that no State or Federal Agency, including but not limited to, the EPA, Maryland Department of the Environment, has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action is not barred by any prior administrative penalty under Section 309(g) of the Act. 33 U.S.C. § 1319(g).

## II. INTRODUCTION

4. This complaint seeks relief from ATC Developers' discharge of polluted

stormwater from their disturbance of 36.23 acres of infrastructure, 27.95 acre of mass grading and 8.29 of additional disturbance at the Annapolis Towne Centre site bordered by Riva Road, Forest Drive, Maryland Route 2, and Sommerville Road in Parole, Anne Arundel County, Maryland (hereinafter "ATC Project"). This site is located on Anne Arundel County Tax Map 51 for the second assessment district, Block Parcels 181 and 269.

5. On July 14, 2005, MDE acknowledged receipt of a Notice of Intent ("NOI") to comply with Maryland's General Permit for Construction Activity ("General Permit") in accordance with EPA's National Pollutant Discharge Elimination System ("NPDES") stormwater program from ATC Developers. Gustavo Arango of ATC at Parole was identified as the principal contact on the NOI. MDE assigned ATC Developers identification number 06AA0005 and provided that they were covered by the General Permit. Thus, the permitee is authorized to discharge stormwater associated with construction activity, as defined in the Clean Water Act, from the ATC Project. The permitee is responsible for compliance with all terms of the General Permit.

6. Citizen Enforcers allege that the ATC Developers have discharged and continue to discharge polluted storm water into waters of the United States in violation of the General Permit and the Clean Water Act. Citizen Enforcers seek relief from the ATC Developers' systematic and continuing violations of the management, monitoring, reporting, and other procedural and substantive requirements of the General Permit.

7. Stormwater from the ATC Project drains into a culvert that directly discharges to Church Creek which flows into the South River, a tributary of the Chesapeake Bay.

8. Pollution carried by stormwater during rain events has been identified in virtually every study conducted as the largest source of contamination to surface waters in Maryland and nationwide. In 2004, pursuant to CWA section 303(d), Maryland identified 473 water bodies as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.

Ninety-one of those water bodies were impaired due to sediment. The South River is one of those bodies of water.

9. The EPA has identified building construction as a serious contributor to the general stormwater pollution problem. Construction sites have been identified as significant dischargers of polluted stormwater, including stormwater containing high concentrations of silt, turbidity, oil, grease, trash, sewage, and other chemicals used in construction activities and equipment maintenance. *National Pollutant Discharge Elimination System – Regulations for Revisions of the Water Pollution Control Program Addressing Storm Water Discharges*, 64 Fed. Reg. 68722, 68728-68733 (December 8, 1999); *Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Construction Activities*, 63 Fed. Reg. 15622, 15627 (March 31, 1998). Thus, construction sites have the potential to chemically, biologically and physically impact water quality.

10. It is generally acknowledged that erosion rates from construction sites are much greater than from almost any other land use activity. *Water Quality: Prevention, Identification and Management of Diffuse Pollution*, Novotny, V. & H. Olem (Van Nostrand Reinhold 1994). A primary focus and intent of the General Permit is the prevention of stormwater pollution in the form of soil erosion and water body sedimentation caused by earth-moving activities at construction sites. Once a site is disturbed by grading and the operation of trucks and other heavy construction equipment, the disturbed land becomes vulnerable to erosion. Any significant rainfall event has the potential to cause large amounts of sediments and other pollutants associated with construction activities to wash down hillsides and into bays, oceans, rivers, and their tributaries, resulting in the deterioration of water quality and harm to aquatic species and habitats. In issuing final regulations in 1990, the EPA noted that "[e]ven a small amount of construction may have a significant negative impact on water quality in localized areas. Over a short period of time, construction sites can contribute more sediment to streams than previously deposited over several decades." 55 Fed. Reg. 47990 (November

16, 1990). Discharges of sediment are of concern because sediment clogs stream channels, reduces stream depth, and destroys aquatic habitat.

11. The problem of construction sediment run-off is a significant factor impeding restoration of the Chesapeake Bay. EPA Office of the Inspector General, *Development Growth Outpacing Progress in Watershed Efforts to Restore the Chesapeake Bay*, p. 3, Report 2007-P-00031, Sept. 10, 2007. Urban run-off, including construction sediment discharges, has been identified as the largest source of nutrient pollution in the Lower Western Shore of Maryland, which includes Anne Arundel County. Maryland Department of Natural Resources, Tributary Strategies, Basin Overview, November 2003; J. Greer, A Stormwater Primer, Chesapeake Quarterly, Vol. 4, No. 4, 2006, Chesapeake Bay Program.

12. In addition to sediment and nutrients, construction sites also generate other types of pollutants including trash, concrete materials, sanitary wastes, oil, grease, fuel, stucco, paint, solvents, debris, and other materials associated with onsite activities.

13. Citizen Enforcers are informed, believe, and allege, that as a result of ATC Developers' failure to comply with the Act and the General Permit, pollutants are exposed to and carried by stormwater from the ATC Project through Anne Arundel County streets and into culverts, storm drains, ditches into Church Creek, the South River, and ultimately to the Chesapeake Bay. Citizen Enforcers are informed, believe, and thereupon allege, that these discharges adversely affect the beneficial uses and ecological health of the Receiving Waters into which the ATC Developers are discharging pollutants.

## III. PARTIES

### A. <u>South Federation and South Riverkeeper</u>

14. The South River Federation is located at 2830 Solomons Island Road, Suite B, Edgewater, Anne Arundel County, MD 21037. The organization has more than 500 members who live and/or recreate in and around the Chesapeake Bay and the South River region including Church Creek.

15. Plaintiff South Riverkeeper, a project of the South Riverkeeper Federation, is a full-time public advocate for a healthy South River. Drew Koslow is also titled the "Riverkeeper," and is located at 2830 Solomons Island Road, Suite B, Edgewater, Anne Arundel County, MD 21037.

16. South River Federation and South Riverkeeper (collectively "Riverkeeper") are dedicated to the preservation, protection, restoration and defense of the environment, wildlife and natural resources of the South River, its tributaries and its ecosystem. Riverkeeper furthers this mission by monitoring and assessment, education, enforcement, restoration, outreach and promotion of responsible stewardship. _When necessary, Riverkeeper directly initiates enforcement actions on behalf of itself and its members.

17. Members of Riverkeeper use and enjoy the South River and Church Creek into which ATC Developers have caused, are causing, and will continue to cause, pollutants to be discharged. Riverkeeper members reside near and enjoy the area waters for recreation, fishing, swimming, kayaking, boating, bird watching, wildlife viewing, and scientific study. ATC Developers' failure to comply with the Act and the General Permit have adversely affected and irreparably harmed the recreational, aesthetic, scientific, educational, conservational and economic interests of South Riverkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law. Riverkeeper's members will continue to be harmed until the ATC Developers bring their construction activities into compliance with the law. The relief sought herein will redress the harm to Riverkeeper members caused by the ATC Developers' activities.

**B. <u>The Chesapeake Bay Foundation, Inc.</u>**

18. Plaintiff, Chesapeake Bay Foundation ("CBF"), is the only independent 501(c)(3) organization dedicated solely to restoring and protecting the Chesapeake Bay and its tributary rivers. Since its founding 40 years ago, its goal has been to improve water quality by reducing pollution. It is headquartered at the Philip Merrill Environmental Center, 6 Herndon Avenue Annapolis, MD 21403. The organization has approximately 200,000 members who live and/or recreate in and around the Chesapeake

Bay and its tributary rivers. Over 90,000 of those members live in Maryland.

19. CBF is dedicated to the preservation, protection, restoration and defense of the environment, wildlife and natural resources of the Chesapeake Bay and its tributary rivers. CBF's approximately 180 staff members work to "Save the Bay" through education programs throughout the Chesapeake Bay Watershed, environmental restoration projects, lobbying at the State and Federal levels, and the use of targeted litigation.

20. Members of CBF use and enjoy the Chesapeake Bay and its tributary rivers, including Church Creek and the South River, into which ATC Developers have caused, are causing, and will continue to cause, pollutants to be discharged. CBF members reside near and enjoy the area waters for recreation, fishing, swimming, kayaking, boating, bird watching, wildlife viewing, and scientific study. ATC Developers' failure to comply with the Act and the General Permit have adversely affected and irreparably harmed the recreational, aesthetic, scientific, educational, conservational and economic interests of CBF's members, for which harm they have no plain, speedy, or adequate remedy at law. CBF's members will continue to be harmed until the ATC Developers bring their construction activities into compliance with the law. The relief sought herein will redress the harm to CBF members caused by the ATC Developers' activities.

**C. <u>ATC Developers</u>**

21. Information currently available to Citizen Enforcers indicates that responsible parties in this action are Annapolis Towne Center at Parole and Greenberg Gibbons Commercial Corporation.

22. Information currently available to Citizen Enforcers indicates that Greenberg Gibbons, Commercial and Annapolis Towne Centre at Parole filed a Notice of Intent to obtain General Permit coverage for the ATC Project under the ownership name "Annapolis Towne Centre at Parole." The application was accepted by MDE on July 14, 2005. The contact person for the owner/developer is listed as Gustavo Arango, Annapolis Towne Centre Parole, 10096 Red Run Blvd., Owings Mills, MD 21117.

23. Information available to Citizen Enforcers indicates that the owner of the ATC Project is Annapolis Towne Centre at Parole, LLC and the developer is Greenberg Gibbons Commercial Corporation in Owings Mills, Maryland.

24. The Resident Agent for Greenberg Gibbons is Robert M. Ercole of Neuberger, Quinn, Geilen, Rubin & Gibbe, located at 27th Floor, One South Street, Baltimore, MD 21202.

25. Information available to Citizen Enforcers further indicates that Greenberg Gibbons is primarily involved in the business of developing, leasing, managing, and investing in commercial real estate.

26. The Resident Agent for Annapolis Towne Center at Parole LLC is also Roberts M. Ercole, Esq., located at 27th Floor, One South Street, Baltimore, MD 21202.

## IV. STATUTORY BACKGROUND

### A. The Clean Water Act

27. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various sections of the Act. The Act requires any person who discharges or proposes to discharge pollutants into the waters of the United States to submit an NPDES permit application. 33 U.S.C. §§ 1342(p)(2)(B), 1342(p)(3)(A); 40 C.F.R. §§ 122.21(a) and 122.26(a)(ii). Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. Section 402(p) of the Act, 33 U.S.C. § 1342(p), establishes a framework for regulating stormwater discharges associated with industrial activity. Construction activities are regulated as an industrial activity under the Act. 40 C.F.R. § 122.26(b)(14)(x). Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f); and 33 U.S.C. § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators

of the Act are also subject to an assessment of civil penalties of $32,500 per day per violation of the Act, pursuant to Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4. Lastly, Section 505(d) of the Act, 33 U.S.C. §1365(d), permits prevailing parties to recover legal fees and costs expended in citizen enforcement of the Act.

## B. The General Permit

28. The EPA has delegated the task of issuing NPDES permits to Maryland pursuant to the provisions of the Act. Section 402(p) of the Act, 33 U.S.C. § 1342(p), establishes a framework for regulating storm water discharges associated with industrial activity under the NPDES permit system.

29. Maryland regulates stormwater generated by construction activities via a General Permit.

30. The owners and operators of construction projects are required to have obtained coverage under the General Permit prior to the initiation of construction activities. Permitees are further required to fully comply with the procedural and substantive requirements of the General Permit during and after construction activities. A violation of the General Permit is a violation of the Act. 33 U.S.C. § 1311.

### 1. Discharge Prohibitions

31. Among other requirements, the General Permit states that the permitee shall, ". . . take all reasonable steps to minimize the environmental impact caused by any discharge allowed by" the permit. Part V.E. To implement these requirements, the General Permit requires that dischargers must obtain an approved erosion and sediment control plan in accordance with requirements established in Title 4, Subtitle 1 of the Environment Article, Annotated Code of MD, and in COMAR § 26. 17. 01. General Permit Part II, A. 3.

### 2. Stormwater Pollution Prevention Plan

32. Developers must also obtain approved stormwater plans prior to the start of soil-disturbing activity.

33. A person planning construction activity must submit a Notice of Intent

("NOI"), at least 48 hours prior to any land disturbing activities, in accordance with the requirements of Part II of the General Permit to be authorized to discharge storm water. Part I, D; Part II. A. 1. ATC Developers submitted a NOI that was approved by MDE on July 14, 2005. A revision of that NOI was approved by MDE on February 1, 2007.

34. Part II. A. 3 of the General Permit specifically references Title 4 Subtitle 1 of the Environment Article (Sediment Control) and the Code of Maryland Regulations related to erosion and sediment control, COMAR 26.17.01, *et seq*. Section 4-101 of the Environment Article provides:

> Because of the great potential for harm to the waters of the State if soil erosion and sediment control measures are not properly implemented and maintained and because of the cumulative effect on the environment of violations whether the project creating the violations is large or small, it is necessary for the protection of the waters of the State to provide procedures for obtaining immediate compliance with the law, when violations occur.

35. Part III. A of the General Permit provides that, with certain exceptions, all discharges covered by the permit shall be composed entirely of storm water. "Discharge of material other than storm water must be in accordance with erosion and sediment control and storm water management plans approved in accordance with the law and regulations cited in Part II. A."

36. Rather than providing specific, numeric effluent limitations for discharges of pollutants from construction sites, the General Permit establishes effluent limitations in terms of performance standards associated with the Best Available Technology ("BAT") for erosion and sediment control and storm water management. Compliance with the BAT associated with the laws and regulations cited in Part II. A of the permit constitute compliance with effluent limitations for storm water discharges associated with construction activity. Part IV. A.

37. Maryland regulations incorporate by reference the handbook titled "1994 Maryland Standards and Specifications for Soil Erosion and Sediment Control"

("Maryland Handbook"), which serves as the official guide for erosion and sediment control principles, methods, and practices in Maryland. COMAR 26.17.01.11.

38. Part II. A. 3 of the General Permit requires that prior to the commencement of construction activities, persons covered by the permit obtain approved erosion and sediment controls plans in accordance with Title 4, Subtitle 1 of the Environment Article and COMAR 26.17.01.

39. The General Permit is specifically conditioned upon the requirement that the permitee comply with erosion and sediment control and storm water management plans approved in accordance with the laws and regulations cited in Part II, A. 3, and with all conditions of the permit. Violations of such plans for construction activity constitute violations of the General Permit, State law, and the CWA.

40. Part V. A. The Grading Plans for the ATC Project approved by Anne Arundel County identify the erosion and sediment controls to be installed at the ATC Project and the conditions of their operation and maintenance. Those plans, among other things, identify the use and location of a super silt fence, one stabilized construction entrance, sediment traps, and earthen berms to control erosion and storm water.

41. The General Permit also provides that once construction has commenced, it is a condition of the permit that erosion and sediment control and storm water management approvals be kept in effect. Part V. B.

### <u>3. Monitoring and Reporting Plan</u>

42. Part IV B of the General Permit requires the permitee to, among other things, conduct weekly inspections of implemented erosion and sediment controls and conduct inspections of erosion and sediment controls the next business day after a rainfall event resulting in runoff. The permitee must maintain at the site written reports of all inspections conducted by the permitee that include, among other things, an assessment of the condition of erosion and sediment controls, and a description of any erosion and sediment control implementation and maintenance performed.

43. Subpart F requires the permitee at all times to "properly operate and maintain

all systems of treatment and control (and related appurtenances) which are installed or used by the permitee to achieve compliance with the conditions of [the] permit. Proper operation and maintenance requires the installation and operation of backup, auxiliary, or similar systems or controls, by a permitee when necessary to achieve compliance with the conditions of the permit."

## V. STATEMENT OF FACTS

44. Information currently available to Citizen Enforcers indicates construction activities at the ATC Project include the following: heavy grading, cutting and filling; clearing of vegetation; landscaping; construction of buildings and roadways; operation of heavy equipment, dirt trucks, trailers and fuel trucks; the loading and unloading of heavy equipment and other vehicles; the on-site maintenance, refueling and storage of heavy equipment; the storage and use of dirt stockpiles, refuse piles, construction materials, fuel tanks and equipment; the pouring of concrete foundations; and, the application of plaster and stucco materials. Information regarding these activities and their regulation can be found in the General Permit and Grading Plans for the ATC Project. Observations made on multiple occasions by Citizen Enforcers indicate that the ATC Developers are and continue to be in violation of the General Permit, the Grading Plans, County and State law, and the Clean Water Act.

45. Information currently available to Citizen Enforcers indicates the Grading and/or Erosion and Sediment Control Plans that identify the location of super silt fences and other erosion and sediment controls to prevent rainfall and storm water flows from coming into contact with sources of contaminants at the ATC Project and to prevent the discharge of such contaminated storm water from off the construction site and into storm drains and area waterways, have either failed or are inadequate to control run off from the site. Specifically, Citizen Enforcers have observed that the ATC Project lacks adequate Best Management Practices ("BMPs"), resulting in the tracking of mud offsite and into the streets, an improperly operated detention basin, the construction and operation of illegal construction entrances, and the discharge of sediment-laden water from the ATC

Project to area storm drains and waters of the United States.

46. Information currently available to Citizen Enforcers indicates the ATC Developers have failed to implement and/or maintain measures to control erosion at the site including having failed to implement adequate berming, temporary stabilization, silt fencing, binding, and cleaning and maintenance of construction entrances to prevent erosion and run off of soil. The ATC Developers also have not implemented adequate measures on finished or unfinished slopes, cuts, roadways, unearthed soil, and inactive areas of the ATC Project to prevent erosion from wind and storm water. Furthermore, the ATC Developers have failed to maintain minimal storm water controls such as adequate sand bag placement to prevent erosion. Each of these failures has enabled storm runoff and/or wind to erode soil and to move pollutants into waters of the United States and the State in violation of the Clean Water Act.

47. Citizen Enforcers documented damaged or inadequate super silt fencing, un-stabilized steep slopes, unstabilized construction entrances, illegal construction entrances, and muddy water running off site at the ATC Project all in violation of the permit and Grading Plans on January 26, February 6, 23 and 26, and March 14 and 16, 2007.

48. Information currently available to Citizen Enforcers indicates ATC Developers have not implemented and maintained sufficient pollution prevention measures at ingress and egress points to prevent track out of sediment, mud, and soil or to prevent erosion from occurring from construction areas. Streets surrounding the ATC Project are frequently covered in mud and debris. As demonstrated by storm water samples set forth in paragraph 50 below, ATC Developers have failed to employ the necessary erosion and sediment controls to ensure that storm water is prevented from coming into contact with, and moving pollutants in storm water flows from these various pollution sources.

49. Information currently available to Citizen Enforcers indicates the ATC Developers have failed to take adequate steps to effectively filter sediments and other pollutants from sediment and pollutant-laden storm water discharges or to prevent their

discharge from the ATC Project. For example, the ATC Developers have not installed, maintained, and operated adequate sediment basins. The ATC Developers have not adequately placed and maintained sand bags, silt fences, fiber rolls, or other erosion and sediment control measures. Where minimal structural controls have been put in place to prevent the discharge of contaminated waters, they have frequently been incapacitated and/or undermined such that their efficacy has been reduced.

50. Information currently available to Citizen Enforcers indicates the ATC Developers have failed to install and implement adequate filtration devices at or near storm drain inlets to effectively prevent silt and pollutants from being discharged from the ATC Project. These failures are evident in the soil, sediment, and mud observed by Citizen Enforcers flowing off the ATC Project and into neighboring streets, storm drains, and ultimately the South River. Sampling conducted by Citizen Enforcers demonstrates the impact of the ATC Developers' failure to implement adequate pollution controls. For example, on September 7-9, October 5-10 and 27, 2006 Citizen Enforcers collected turbidity data from the storm water discharged from the ATC Project using an in-stream turbidity monitor calibrated by a State certified technician. The monitor found the following levels of turbidity: 814 nephelometric turbidity units ("ntu") on September 6, 250-300 ntu on September 7; 164 ntu on October 5; in excess of 100 ntu on October 8 – 10, and; 599 ntu on October 27, 2006. On November 16, 2006 and again on January 9, 2007 muddy discharges were observed from the ATC Project outfall to Church Creek, a tributary of the South River. All of these readings were in excess of the applicable turbidity standards of 150 ntu instantaneous maximum or 50 ntu monthly average, demonstrating that the controls implemented at the ATC Project by the ATC Developers are inadequate. See Maryland Department of the Environment, Water Quality Criteria Specific to Designated Uses: Code of Maryland Regulations (COMAR) 26.08.02.03-3, available at http://www.dsd.state.md.us/comar/26/26.08.02.03%2D3.htm.

51. Shortly after the January 9, 2007 event, the ATC Developers were cited and fined by Anne Arundel County for stormwater violations. However, similar violations

have continued at the ATC Project.

52. Information currently available to Citizen Enforcers indicates that because of the ATC Developers' failure to implement the necessary controls and management practices at the ATC Project, stormwater associated with construction activity, and storm water contaminated with pollutants, have been and are being discharged from the ATC Project through Anne Arundel County streets and into culverts, storm drains, ditches and ultimately to Church Creek and the South River. These discharges are detrimental to water quality and are harming the many plants and animals that occupy or use these waterways, and the beneficial uses of these waterways.

53. The State of Maryland has designated beneficial uses of the South River that include Water Contact Recreation, Shellfish Harvest, and Protection of Aquatic Life. *Available at* http://www.chesapeakebay.net/pubs/waterqualitycriteria/DOC_md.pdf. Further, South River is listed on Maryland's Clean Water Act Section 303(d) list of impaired water bodies as impaired for silt/sediment. Information currently available to Citizen Enforcers indicates the construction activities at the ATC Project are representative of activity that contributes to the impairment of Church Creek and the South River and results in the inability of the creek and river to sustain the State designated beneficial uses.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Stormwater in Violation of General Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342**

54. Citizen Enforcers re-allege and incorporate all of the allegations contained in the preceding paragraphs as though fully set forth herein.

55. Citizen Enforcers are informed, believe and thereupon allege that ATC Developers discharges stormwater contaminated with pollutants from the ATC Project to receiving waters and waters of the United States. The ATC Project is not in compliance with the terms of the General Permit and the ATC Developers are therefore violating the

Clean Water Act each time they have discharged and continue to discharge stormwater contaminated with pollutants from the ATC Project.

56. Citizen Enforcers' investigators have observed and photographed inadequate erosion and sediment controls and non-compliance with the Maryland Handbook and the approved Grading Plans at the ATC Project. Citizen Enforcers are informed, believe, and thereupon allege that because the ATC Developers failed to implement adequate pollution control measures, the ATC Project has discharged and continues to discharge contaminated storm water during significant rain events (defined by EPA as a rainfall event generating 0.1 inches or more of rain). Rain data collected at the Annapolis Naval Academy Rain Gauge recorded at least 77 rain events over 0.1 inches in 2006, and at least 44 rain events over 0.1 inches to date in 2007. Thus, ATC Developers have discharged polluted stormwater in violation of the General Permit and the Act on at least 121 occasions since obtaining permit coverage.

57. Citizen Enforcers are informed, believe, and thereupon allege that these discharges of contaminated stormwater are causing or threatening to cause the discharge of stormwater in violation of the performance standards associated with BAT for erosion and sediment control and stormwater management, and in violation the General Permit and the Sediment and Erosion Control provisions of the Grading Permit Plan approved by Anne Arundel County Soil Conservation District.

58. Citizen Enforcers are informed, believe, and thereupon allege that these discharges also have adversely impacted human health and the environment in violation of the General Permit.

59. Citizen Enforcers are informed, believe, and thereupon allege that from the day operations commenced or soil-disturbing activities began through the present at the ATC Project, ATC Developers have discharged and will continue to discharge stormwater containing pollutants from the site to area waterways during every significant rain event and even sometimes days after a rain event.

60. Every discharge of contaminated stormwater since soil-disturbing operations

commenced at the ATC Project is a separate and distinct violation of Section 301(a) of the Clean Water Act. 33 U.S.C. § 1311(a).

61. Pursuant to Section 309(d) of the Clean Water Act, the ATC Developers are subject to penalties for all violations of the General Permit and the Clean Water Act occurring within the past five years. 33 U.S.C. § 1319 (d).

62. Continuing commission of the acts and omissions alleged above will irreparably harm Citizen Enforcers and the citizens of the State of Maryland, for which harm they have no plain, speedy, or adequate remedy at law.

63. WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Failure to Implement an Adequate Sediment and Erosion Control Plan in Violation of the General Permit and the CWA, 33 U. S. C. §§ 1311, 1342**

64. Citizen Enforcers reallege and incorporate all of the allegations contained in the preceding paragraphs as though fully set forth herein.

65. Citizen Enforcers are informed, believe, and thereupon allege that the ATC Developers have developed an erosion and control plan that appears to comply with the Permit Requirements, including the requirements of the Maryland Handbook.

66. Information currently available to Citizen Enforcers indicates, however, that the ATC Developers have failed to implement the Sediment and Erosion Control Plan.

67. Citizen Enforcers' investigators have observed and photographed improperly installed silt fencing, torn silt fencing, poorly maintained construction entrances, construction entrances not identified in the Sediment and Erosion Control Plan, and excavation activities outside of stormwater BMPs at the ATC Project.

68. Citizen Enforcers are informed, believe, and thereupon allege as a result of the ATC Developers' failure to adequately implement the required erosion and sediment controls at the ATC Project, the ATC Developers have been in daily and continuous violation of the General Permit requirements and the CWA on each and every date since

the day operations commenced or when soil-disturbing activities began at the ATC Project through the present.

69. Citizen Enforcers are informed, believe, and thereupon allege that these violations are ongoing. The ATC Developers will continue to be in violation every day that they fail to develop and/or implement adequate erosion and sediment controls for the ATC Project. Every day since the date that operations commenced or soil-disturbing activities began at the ATC Project through the present that the ATC Developers have operated with an inadequately implemented erosion and sediment control plan for the ATC Project is a separate and distinct violation of Section 301(a) of the Clean Water Act. 33 U.S.C. § 1311(a).

70. Citizen Enforcers are informed, believe, and thereupon allege that since at least July 14, 2005, when the ATC Developers obtained coverage under the General Permit, and continuing through the present, the ATC Developers have committed at least 802 violations and days of violation of the Clean Water Act, and those violations are continuing.

71. Pursuant to Section 309(d) of the Clean Water Act, the ATC Developers are subject to penalties for all violations of the General Permit and the CWA occurring within the past five (5) years. 33 U.S.C. § 1319 (d).

72. Continuing commission of the acts and omissions alleged above will irreparably harm Citizen Enforcers and the citizens of the State of Maryland, for which harm they have no plain, speedy, or adequate remedy at law.

73. WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Non-Stormwater in Violation of General Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342**

74. In 2006, Riverkeeper installed an auto-sampler immediately downstream from the ATC Project. Rainfall was reported on September 5, 2006. Two days later on September 7, 2006, a dry day, the auto-sampler recorded the discharge of non-stormwater

at 250-300 ntu. On September 9, 2006, three days after a rain event, the auto-sampler recorded the discharge of non-stormwater at over 100 ntu. On September 11, 2006, the auto-sampler recorded a non-stormwater discharge at over 500 ntu.

75. On January 9, 2007, a dry day, Citizen Enforcers' investigators observed and photographed a discharge to Church Creek of highly turbid non-stormwater. This was apparently caused by pumping between detention basins that caused an overflow. On March 19, 2007, Citizen Enforcers' investigators again observed and photographed a discharge to Church Creek of highly turbid non-stormwater to Church Creek.

76. Citizen Enforcers' investigators have observed, photographed, and/or sampled polluted non-stormwater discharges from the ATC Project in violation of the General Permit and the Clean Water Act on at least 5 occasions, and these violations are continuing. Citizen Enforcers believe that additional non-stormwater discharges will be discovered when it obtains the inspections reports generated by the ATC Developers and Anne Arundel County. Citizen Enforcers specifically puts the ATC Developers on notice of its intent to include those additional violations in its enforcement action. Conditions at the site have continued unchanged since construction activities at the site began. Therefore non-stormwater discharges from the ATC Project are virtually certain to continue.

## FOURTH CAUSE OF ACTION

### Failure to Develop and/or Implement an Adequate Monitoring and Reporting Program in Violation of General Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342

77. Citizen Enforcers reallege and incorporate all of the allegations contained in the preceding paragraphs as though fully set forth herein.

78. Citizen Enforcers are informed, believe, and thereupon allege that Citizen Enforcers' investigation of the conditions at the ATC Project demonstrates that the ATC Developers have failed to adequately develop and/or implement erosion and sediment controls in compliance with the General Permit at the ATC Project. Adequate

development and implementation of a monitoring program would have alerted the ATC Developers to the inadequate erosion control measures at the site, and would have led to repairs and/or improvements sufficient to eliminate the polluted discharges that occurred during every rain event.

79. Citizen Enforcers are informed, believe, and thereupon allege that the ATC Developers have failed to monitor, identify, and correct failures of the erosion and sediment controls at the ATC Project as required by the General Permit and the Maryland Handbook.

80. Citizen Enforcers are informed, believe, and thereupon allege that as a result of the ATC Developers' failure to adequately comply with the monitoring and reporting requirements of the General Permit at the ATC Project, the ATC Developers have been in daily and continuous violation of the General Permit requirements and the CWA on each and every date since the day operations commenced or when soil-disturbing activities began at the ATC Project through the present.

81. Citizen Enforcers are informed, believe, and thereupon allege that these violations are ongoing. The ATC Developers will continue to be in violation every day that they fail to develop and/or implement an adequate Monitoring and Reporting Program ("M&RP") for the ATC Project. Every day since the day operations commenced or when soil-disturbing activities began at the ATC Project through the present that the ATC Developers have operated with an inadequately developed and/or implemented M&RP for the ATC Project is a separate and distinct violation of Section 301(a) of the Clean Water Act. 33 U.S.C. § 1311(a).

82. The ATC Developers are subject to penalties for all violations of the General Permit and the Clean Water Act occurring within the past five (5) years. 33 U.S.C. § 1319 (d). Since July 14, 2005, when the ATC Developers initially obtained coverage under the General Permit, and the present, the ATC Developers have committed at least 802 violations and days of violation of the Act, and those violations are continuing.

83. Continuing commission of the acts and omissions alleged above will

irreparably harm Citizen Enforcers and the citizens of the State of Maryland, for which harm they have no plain, speedy, or adequate remedy at law.

## VII. RELIEF REQUESTED

84. Wherefore, Citizen Enforcers respectfully requests that this Court grant the following relief:

a. Enter judgment declaring that the ATC Developers have violated and are in violation of the requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), as alleged herein, for violating the procedural and substantive requirements of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342;

b. Issue a Court order enjoining the ATC Developers from further violating the substantive and procedural requirements of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d);

c. Issue a Court order enjoining the ATC Developers from discharging pollutants from its ATC Project into the streets, storm drain system and surface waters surrounding and downstream from the ATC Project;

d. Issue a Court order requiring ATC Developers to take appropriate actions to restore the quality of waters of the United States impaired by their activities including prohibiting discharges other than those in compliance with the General Permit;

e. Issue a Court order requiring ATC Developers to pay civil penalties of $32,500 per day per violation or such other amount as the Court may deem appropriate, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 – 19.4;

f. Issue a Court order awarding Plaintiff's costs (including reasonable attorney and expert fees, and other litigation costs) as authorized by the Act, 33 U.S.C. § 1365(d), and;

g. Grant any such other and further relief as this Court may deem appropriate.

//

//

Dated: September 25, 2007

Thomas A. Deming
Bar Number 05197
506 Sunwood Lane
Annapolis, MD 21409
(410) 757-0100
Fax: (410) 757-8201
Email: tdeming@cablespeed.com

Of Counsel:

Daniel Cooper
LAWYERS FOR CLEAN WATER, INC.
1004 O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155

Jon A. Mueller
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
Telephone: (443) 482-2162

Douglas Wolf
SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY LLP
1425 K Street, NW, Suite 600
Washington, D.C. 20005
Telephone: (202) 682-0240